David C. Parisi (SBN 162248)
Suzanne Havens Beckman (SBN 188814)
Parisi & Havens LLP
15233 Valleyheart Drive
Sherman Oaks, CA 91403
(818) 990-1299
dparisi@parisihavens.com
shavens@parisihavens.com

Michael J. McMorrow (*Pro Hac Vice*)
KamberEdelson, LLC
350 North LaSalle Street, Suite 1300
Chicago, IL 60654
(312) 589-6370
mmcmorrow@kamberedelson.com

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| DAVID LEVIN, an individual, on his own behalf and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>CITIBANK, N.A., a national banking association,<br><br>*Defendant*. | Case. No.: C 09-00350-MMC<br><br>**PLAINTIFF DAVID LEVIN'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**<br><br>The Hon. Maxine M. Chesney<br><br>Date:   August 28, 2009<br>Time:   9:00 a.m.<br>Courtroom 2 |

# TABLE OF CONTENTS

**INTRODUCTION**......................................................................................................... 1

**STATEMENT OF FACTS** ........................................................................................... 2

**ARGUMENT** ............................................................................................................... 3

**I.** **Counts I-III:  The Complaint Alleges Sufficient Facts to Show Citibank
Violated TILA And Breached Its Contracts**................................................. 5

      A. *The Complaint adequately alleges Citibank violated TILA and Regulation
Z in Counts I and II*.................................................................................. 5

            1. Failure to Ensure Significant Decline Prior to Credit Line Reduction ...... 6

            2. Failure to Provide Timely and Specific Notice........................................... 7

            3. Improperly Requiring Upfront Fees for Citibank's Investigation.............. 8

            4. Citibank's use of an AVM to determine property values does not
automatically inoculate it against claims the model unreasonably
used inaccurate and unreliable data............................................................ 8

      B. *The Complaint adequately alleges Citibank breached Levin's HELOC
contract* ..................................................................................................... 9

**II.** **Counts V, VIII and X: Citibank's Violations Of The Covenant of Good Faith
and Fair Dealing Are Sufficiently Pleaded And Should Not Be Dismissed** ............... 11

**III.** **Count VI:  Levin States Claims for Fraudulent Concealment** .................................13

**IV.** **Counts IV, VII, IX and XI:  The Complaint Sufficiently Sets Forth Claims
Under California's UCL** ............................................................................... 14

**V.** **Count I, IV, VII, IX and XI: Levin Has Standing To Pursue Declaratory Relief
Under TILA And The UCL**........................................................................... 16

**CONCLUSION**........................................................................................................... 19

1

2

## **TABLE OF AUTHORITIES**

3

**UNITED STATES SUPREME COURT**

4

*Ashcroft v. Iqbal,*
    556 U.S. - - , 129 S. Ct. 1937 (2009) ..........................................................5-6

5

6

*Gibson v. U.S.,*
    781 F.2d 1334 (9th Cir. 1986)................................................................ 5

7

8

*Swierkiewicz v. Sorema,*
    534 U.S. 506 (2002).............................................................................4-5

9

**FEDERAL COURT CASES**

10

11

*Barrett v. JP Morgan Chase Bank, N.A.,*
    445 F.3d 874 (6th Cir. 2006)................................................................ 17

12

13

*Cattie v. Wal-Mart Stores, Inc.,*
    504 F. Supp. 2d 939 (S.D. Cal. 2007) .................................................. 16

14

*Deitz v. Comcast Corp.,*
    No. C 06-06352 WHA, 2006 WL 3782902 (N.D. Cal. Dec. 21, 2006)...................... 16-17

15

16

*Doe v. U.S.,*
    58 F.3d 494 (9th Cir. 1995)................................................................. 19

17

18

*Handy v. Anchor Mortgage. Corp.,*
    464 F.3d 760 (7th Cir. 2006)................................................................ 17

19

20

*Hodgers-Durgin v. De La Vina,*
    199 F.3d 1037 (9th Cir. 1999)............................................................... 16

21

*Johnson v. Riverside Healthcare* Sys, *LP,*
    534 F.3d 1116 (9th Cir. 2009)..............................................................4-5

22

23

*King v. California,*
    784 F.2d 910 (9th Cir. 1986)................................................................ 17

24

25

*Langadinos v. Am. Airlines, Inc.,*
    199 F.3d 68 (1st Cir. 2000) ................................................................. 9

26

*Melanson v. United Air Lines, Inc.,*
    931 F.2d 558 (9th Cir. 1991)................................................................ 13

27

28

*McCollum v. XCare.Net, Inc.,*
    212 F. Supp. 2d 1142 (N.D. Cal. 2002) .................................................. 12

*Monaco v. Bear Stearns Residential Mortgage Corp.*,
    554 F. Supp. 2d 1034, 1039-40 (C.D. Cal. 2008) ........................................................ 15

*Nelsen v. King County*,
    895 F.2d 1248 (9th Cir. 1990)................................................................................ 16-17

*Schreiber Distrib. Co. v. Serv-Well Furniture Co.*,
    806 F.2d 1393, 1401 (9th Cir. 1986)............................................................................ 19

*Slottow v. Am. Casualty Co. of Reading, PA*,
    10 F.3d 1355 (9th Cir. 1993)........................................................................................ 7

*Thompson v. Davis*,
    295 F.3d 890 (9th Cir. 2002)...................................................................................... 4-5

*Wyeth v. Anchen Pharm.*,
    No. SACV06-386JVS (MLGx), 2006 WL 6103249 (C.D. Cal. Dec 20, 2006) ....... 5, 9, 11

**CALIFORNIA STATE CASES**

*Guz v. Bechtel Nat'l. Inc.*,
    24 Cal. 4th 317 (2000) ................................................................................................ 12

*Helfand v. Nat'l Union Fire Ins. Co.*,
    10 Cal. App. 4th 869 (1st Dist. 1992) ......................................................................... 12

*Tahoe Nat'l Bank v. Phillips*,
    4 Cal. 3d 11 (1971) ...................................................................................................... 7

**STATUTES**

12 C.F.R. § 226.5b(f) ......................................................................................................... 6

12 C.F.R. § 226.9(c)(3) ............................................................................................... 7, 12-14

12 C.F.R. § 226.5b(f)(3)(vi) .............................................................................................. 6

12 C.F.R. § 226.5b(f)(3)(vi)(A) ........................................................................................ 6

15 U.S.C. § 1647(c)(2)(B) ................................................................................................. 6

**OTHER SOURCES**

12 C.F.R. pt 226 Supp. I. ............................................................................................. 8

Office of Thrift Supervision, HOME EQUITY LINE OF CREDIT
      ACCOUNT MANAGEMENT GUIDANCE .......................................................... 6, 7, 9

May 16, 2005, Office of Thrift Supervision
      CREDIT RISK MANAGEMENT GUIDANCE FOR HOME EQUITY LENDING. ............................... 9

RESTATEMENT (SECOND) OF CONTRACTS § 205 .......................................................... 11

1

**INTRODUCTION**

2      The availability of credit is vital.  Unlike a loan, credit ensures that money will be there

3  when it is needed.  Serving as the lifeblood of the economy,[1] credit allows businesses and

4  consumers alike to regulate the payment of bills, deal with unexpected costs, and generally sleep

5  better at night.  Citibank not only knows this—it banks on it, warning in advertisements on its

6  website that consumers must plan "for the unexpected by establishing a readily available home

7  equity line of credit.  By establishing a credit line, you can give yourself the security of having

8  access to funds at the write of a check."[2]

9      As David Levin and countless other Citibank customers have discovered, however, the

10  security Citibank promises is illusory.  Levin established a home equity line of credit ("HELOC")

11  with Citibank in July 2006.  In exchange, he gave Citibank a mortgage on his property, $434.25

12  in closing costs, and a $50 annual fee.  Levin used his HELOC when he needed it and was careful

13  to never miss a payment, exceed his credit limit, or otherwise default.  Despite this, in March

14  2008, Levin received a letter – sent <u>after</u> Citibank had taken action – informing him that his

15  HELOC credit limit had been lowered to the amount he owed on it.  The letter did not tell Levin

16  the specific reason why he could no longer access his HELOC; rather, Citibank asserted its action

17  was due to a vague "significant decline" in home values in his area, including his.  Levin

18  complained, but Citibank refused to reinstate his credit unless he obtained an appraisal at his own

19  expense showing that the property value had "recovered" to an amount that Citibank refused to

20  disclose to him.  When Levin tried going to a different bank, Citibank charged him a $434 early

21  termination fee for closing the account it would not let him use.

22      The Truth in Lending Act, 15 U.S.C. §§ 1601- 1667f, ("TILA") and its implementing

23  regulation, Regulation Z, prevent banks from arbitrarily reducing HELOC credit limits.  Banks

24  are required to individually assess the value of the collateral securing the HELOCs before

25

---

26  [1]    As Plaintiff's concurrently filed Opposition to Citibank's Motion to Strike Certain

27  Allegations makes clear, credit is so fundamental to the national economy that ensuring its
availability was the purpose of the taxpayer bailout in the first place.
[2]    *See* URL http://www.myhomeequity.com/HomeEquity/majorPurchase.do.  (Last visited

28  July 22, 2009.)

reducing their credit limits, and a significant decline in value must occur prior to action being taken. Citibank does not argue that it made such an evaluation of Levin's individual property—it argues that it did not need to.

Levin adequately alleges each of the eleven counts of the Complaint, all of which stem from Citibank's illegal reduction of his HELOC and the damages Levin, and the putative class, suffered as a result. Citibank's Motion to Dismiss ("Def. Mot.") raises a number of defenses, most of which claim that Citibank did not violate TILA or its agreement with Levin, and none of which are correct. Citibank does not actually challenge the allegations in the Complaint; it mischaracterizes them in an attempt to downplay the fact that it has unlawfully reduced the credit limits of thousands of its borrowers in an effort to limit its exposure and inflate its balance sheet.

The only question before the Court at this time is whether Citibank has carried its burden to show, as a matter of law, that Levin failed to state claims under the federal notice pleading requirements. Citibank makes no such showing and instead dances around the core allegations in the Complaint. Levin has sufficiently and effectively pleaded his claims as a matter of law and, for all the reasons set forth below, Citibank's motion should be denied in its entirety.

## STATEMENT OF FACTS

On July 7, 2006, Levin entered into a HELOC agreement with Citibank whereby Citibank promised to provide him a $144,000 line of credit secured by a mortgage on Levin's property. (Compl. ¶ 14.) Essentially parroting federal law, Citibank's HELOC agreements with Levin and its other borrowers provided that Citibank could decrease a credit limit "during any period in which . . . [t]he value of the [consumer's] Property declines significantly below the Property's appraised value. . . ." (*See* HELOC Agreement ("HELOC"), a true and accurate copy of which is attached as Exhibit A to Citibank's Request for Judicial Notice in Support of its Motion to Dismiss (Dkt. 34).) Although Citibank's HELOC agreement fails to define "significant decline," the Federal Reserve Board's Official Staff Commentary to Regulation Z defines "significant decline" as a decline in home value so that "the initial difference between the credit limit and the available equity (based on the property's appraised value. . .) is reduced by fifty percent."

Moreover, "a significant decline must occur before [credit limit] suspension can occur." (Compl. ¶ 31; *see also* 12 C.F.R. § 226.5b(f)(3)(vi)).

On March 17, 2008, Citibank decreased Levin's credit limit to just over his available balance. (Compl. ¶ 15.) Citibank mailed out notice of its action the next day, but Levin did not receive the notice until March 21, 2008. (Compl. ¶ 16.) Pursuant to the terms of the HELOC, Citibank's notice to Levin was deemed "given" on March 21, 2008, or four days after the action was taken. (HELOC ¶ 22; Compl. ¶¶ 15-16.) Subsequent to Citibank's reduction in his credit line, but prior to receiving any notice of such action, Levin had written two checks drawn from his HELOC. (Compl. ¶ 16.) Citibank refused to honor these draws, causing Levin to incur "not-sufficient-funds" fees. (Compl. ¶ 16.)

Levin was not the only Citibank customer whose credit limit was summarily reduced. Rather, thousands of borrowers received the same letter from Citibank indicating that their credit limits had been reduced. Citibank sent these notices despite the fact that, as was the case with Levin, many of these borrowers had not suffered a "significant decline" in the value of their homes. (Compl. ¶ 3.) On information and belief, Citibank did not specifically value Levin's or anyone else's home, but rather utilized automated valuation models ("AVM"), which are computerized econometric models tied to a database of information related to home values. (Compl. ¶ 3.) On information and belief, these AVMs were flawed, subject to manipulation, and unreasonably used by Citibank to devalue Levin's property in order to improperly reduce his credit limit and those of the other class members. (Compl. ¶ 35.)

Under the terms of the HELOC and Regulation Z, Citibank was obligated to investigate any requests for credit limit reinstatement and was only entitled to bill its customers for any bona fide and reasonable appraisal fees incurred in that investigation. (HELOC ¶ 10.) After receiving notification that his credit limit had been reduced by $80,000, Levin called Citibank and was advised that Citibank would only reinstate the original credit limit if he obtained his own appraisal, at his own expense, indicating that his home value had not significantly declined. (Compl. ¶ 17.) At no point did Citibank ever tell Levin what it, Citibank, considered to be the value of his home, and at no point did Citibank ever identify to Levin what property value would

be required in order for Citibank to reinstate his credit limit.  (Compl. ¶ 17.)  In reality, Levin's home value had not significantly declined and, in fact, had declined only marginally—less than ten percent.  (Compl. ¶¶ 20, 34, 47.)

Citibank's systematic, mass reduction of the credit limits on its HELOCs was illegal, deceptive and unfair, and Levin and the other class members sustained a variety of damages from Citibank's conduct.  In addition to the not-sufficient-funds fees that Levin and other NSF Subclass members were forced to pay, Levin also paid a $50 annual fee to Citibank to maintain his HELOC account.  Levin never received the full benefit of that bargain, however, since his credit limit was summarily reduced by approximately 60%.  (Compl. ¶ 18.)  Additionally, Levin's HELOC with Citibank was his primary line of credit.  (Compl. ¶ 19.)  Citibank's unilateral reduction of Levin's credit limit dramatically lowered the ratio of credit that Levin had available to him as compared to the outstanding balance on that credit, thus adversely affecting his credit rating.  (Compl. ¶ 19.)  Citibank's unfair and illegal actions forced Levin to find a replacement home equity line lender, which necessitated the payment of substantial closing costs in addition to Citibank's assessment of a $434 early termination fee.  (Compl. ¶ 20.)  Citibank's unfair and illegal actions were not unique to Levin—its greed extended to thousands of class members and the adverse effects have been substantial.

## ARGUMENT

In reviewing a motion to dismiss, the court reviews all facts alleged in the complaint and any reasonable inferences in the light most favorable to the plaintiff.  *Johnson v. Riverside Healthcare Sys, LP*, 534 F.3d 1116, 1122 (9th Cir. 2008).  A motion to dismiss must be denied if the complaint contains factual allegations which, when accepted as true, "state a claim for relief that is plausible on its face."  *Id*.  The standard in federal court is one of notice pleading. Accordingly, a plaintiff is generally not required to plead the facts or the elements of a claim. *Swierkiewicz v. Sorema*, 534 U.S. 506, 511 (2002), and a pleading need not contain all the facts that will be necessary to prevail.  A complaint requires only a "short and plain" statement, which suffices if it notifies the defendant of the principal events and the claims it is called upon to meet. *Johnson*, 534 F.3d at 1122.  Dismissal of a claim is warranted only if it "appears beyond doubt

that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief." *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002). Even if any recovery for plaintiff is remote or unlikely, the notice pleading requirements of federal court dictate that the complaint need only provide fair notice of a legally plausible claim. *Johnson*, 534 F.3d at 1123-24. As shown below, the instant Complaint puts Citibank on notice of the claims it must defend.

## I.   Counts I-III:  The Complaint Alleges Sufficient Facts to Show Citibank Violated TILA And Breached Its Contracts.

TILA and Regulation Z specify what a bank can and cannot include in its HELOC agreements. As a result, HELOC agreements, including Levin's contract, tend to mimic the requirements of federal law. Under such circumstances it is not surprising that conduct that violates Regulation Z will also necessarily result in a breach of the HELOC agreement.

### A.   *The Complaint adequately alleges Citibank violated TILA and Regulation Z in Counts I and II.*

Citibank does not dispute that Counts I and II, if sufficiently pleaded, state valid causes of action for violating TILA. The only question before the Court is whether the pleading places Citibank on sufficient notice of those claims. To hear Citibank tell it, the allegations consist of little more than a simple statement that it violated TILA and Regulation Z. According to Citibank, the Complaint fails because it does not include the specific value of Levin's home either initially or at the time of his most recent appraisal. This argument lacks factual and legal support.

The facts supplied are sufficient under federal notice pleading even absent the numerical value of Levin's appraisal. *See Swierkiewicz*, 534 U.S. at 511 (plaintiff is not required to plead the elements of a claim); *see also Gibson v. U.S.*, 781 F.2d 1334, 1340 (9th Cir. 1986) (plaintiff is not expected "to plead his evidence" or specific factual details in advance of discovery); *Wyeth v. Anchen Pharm.*, No. SACV06-386JVS (MLGx), 2006 WL 6103249, at *3 (C.D. Cal. Dec. 20, 2006) ("plaintiffs need not plead the particular facts constituting [a non-fraud claim such as] willful infringement with specificity"). Ultimately, the Complaint survives because Levin amply alleges facts which, taken as true, "plausibly suggest an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. - - , 129 S. Ct. 1937, 1951 (2009). Citibank's arguments to the contrary are little more

than an attempt to have him prove his case at the pleading stages, and because federal law does not require as much, Citibank's motion should be denied.

In reality, Citibank attempts to squeeze a fact-pleading requirement out of the Supreme Court's recent decision in *Iqbal*. Such emphasis is misplaced as Counts I and II are more than sufficient to allow the Court, if the allegations were proven true, "to draw the reasonable inference that [Citibank] is liable for the misconduct alleged." Indeed, the Complaint describes Citibank's specific actions in: (1) failing to ensure a significant decline in value had effected Levin's home prior to reducing his HELOC credit limit, (2) failing to provide him the required notice, (3) failing to follow Regulation Z's requirements by shifting the burden onto borrowers to pay for an appraisal upfront, and (4) using faulty AVMs.

### 1.     Failure to Ensure Significant Decline Prior to Credit Line Reduction

As alleged, TILA and Regulation Z restrict Citibank from changing any terms of a HELOC, including the credit limit. (Compl. ¶ 30; 12 C.F.R. § 226.5b(f)). Lenders may only reduce a credit limit when the value of the consumer's principal dwelling which secures any outstanding balance is significantly less than the original appraised value of the dwelling for the purposes of the plan. 15 U.S.C. § 1647(c)(2)(B); 12 C.F.R. § 226.5b(f)(3)(vi)(A). The Federal Reserve Board's Official Staff Commentary to Regulation Z has interpreted "significant decline" as a drop in value such that the difference between the credit limit and available equity at the time that the HELOC account was granted has been reduced by fifty percent from the difference between these values at the time that the HELOC account was granted."[3] 12 C.F.R. § 226.5b(f)(3)(vi), cmt. 6.

Critically, before making a reduction, a lender cannot use general property value declines in a geographic area but instead must first "assess the value of the collateral that secures each affected HELOC account" because "a significant decline must occur before credit limit suspension can occur." 12 C.F.R. § 226.5b(f)(3)(vi), cmt. 6; *see also* Office of Thrift Supervision,

---

[3]     12 C.F.R. pt. 226, Supp. I, commentary to paragraph 226.5b(f)(3)(vi), cmt. 6 provides the following example: Assume that a house with a first mortgage of $50,000 is appraised at $100,000 and a $30,000 HELOC account is opened. The difference between the HELOC limit and available equity is $20,000, half of which is $10,000. The creditor could prohibit further advances or reduce the credit limit if the value of the property declines from $100,000 to $90,000.

HOME EQUITY LINE OF CREDIT ACCOUNT MANAGEMENT GUIDANCE, 2 ("OTS Guidance") (attached as Ex. C to the "Decl. of Howard Miller in Support of Citibank's Motion to Dismiss" (Dkt. 33-1)).  Although a lender need not obtain an appraisal to lower the line initially, a lender should have a sound factual basis prior to taking such action.  (*See* OTS Guidance 2-3.)

In March 2008, Citibank reduced Levin's credit limit because, purportedly, "home values in [his] area, including [his] home value, ha[d] significantly declined."  (Compl. ¶ 3.)  This is despite the fact that Levin's house had not significantly declined in value but had rather declined "less than 10 percent, "only marginally," and "not enough to justify a reduction of his HELOC's credit limits."  (Compl. ¶¶ 3, 34.)  The Complaint also alleges that Citibank failed to comply with Regulation Z's requirement that a "significant decline" must occur "before suspension can occur."  (Compl. ¶ 31.)

> 2.      Failure to Provide Timely and Specific Notice

Additionally, TILA and Regulation Z require that if a creditor prohibits additional extensions of credit or reduces the credit limit applicable to a home equity plan pursuant to § 226.5b(f)(3)(vi):

> the creditor shall mail or deliver written notice of the action to each consumer who will be affected. The notice must be provided not later than three business days after the action is taken and shall contain specific reasons for the action within three business days of the action containing the specific reasons for the action.

12 C.F.R. § 226.9(c)(3).

Citibank's letter was neither timely nor sufficiently specific.  Pursuant to the terms of the HELOC – drafted by Citibank – Citibank's notice to Levin was deemed given three days after being placed in the mail (March 18, 2008) or on March 21, 2008.  (HELOC ¶ 22; Compl. ¶¶ 15-16.)[5]  Since that is the <u>fourth</u> business day following the March 17, 2008 reduction, Citibank's

---

[5]      At best, Citibank can assert that it is unclear when the notice was deemed given, but this does not change the result. *See Tahoe Nat'l Bank v. Phillips*, 4 Cal. 3d 11, 20 (1971) ("Since the alleged ambiguities appear in a standardized contract, drafted and selected by the bank, which occupies the superior bargaining position, those ambiguities must be interpreted [against] the bank."); *see also Slottow v. Am. Casualty Co. of Reading, PA*, 10 F.3d 1355, 1361 (9th Cir. 1993).

1  notice violates Regulation Z's requirement of notice "no more than three business days"

2  following the decision.  Moreover, and despite the requirement that the notice be specific, the

3  letter is silent with respect to what value Levin's home had supposedly declined from, the

4  supposed new value, an amount by which it had purportedly declined, or how Citibank reached its

5  conclusion.  Citibank sent identical letters to thousands of homeowners.  (Compl. ¶ 3.)

6             3.        Improperly Requiring Upfront Fees for Citibank's Investigation

7        Regulation Z also states that, "Once the consumer requests reinstatement, the creditor

8  must promptly investigate to determine whether the condition allowing the freeze continues to

9  exist."  *See* 12 C.F.R. pt. 226 Supp. I., commentary to paragraph 226.5b(f)(3)(vi), cmt. 4.  In

10  connection with its investigation, Regulation Z allows:

11       a creditor to collect only bona fide and reasonable appraisal and credit report fees
        if such fees are actually incurred in investigating whether the condition permitting

12       the freeze continues to exist.  A creditor may not, in any circumstances, impose a
        fee to reinstate a credit line once the condition has been determined not to exist.

13  *See* 12 C.F.R. pt 226 Supp. I., commentary to paragraph 226.5b(f)(3)(vi), cmt. 3.

14        Citibank's letter and process required Levin, if he wished to dispute the charges, to call

15  Citibank and for him to order and pay for an appraisal upfront, notwithstanding the fact

16  Regulation Z contemplates that, upon request, Citibank will perform the investigation and then

17  only charge bona fide appraisal fees incurred.  (Compl. ¶ 3; *see also* 12 C.F.R. pt 226 Supp. I.,

18  commentary to paragraph 226.5b(f)(3)(vi), cmts. 3 and 4.)

19             4.        Citibank's use of an AVM to determine property values does not
                       automatically inoculate it against claims the model unreasonably used

20                      inaccurate and unreliable data.

21       Citibank's next argument is that Levin cannot establish a TILA violation "predicated on

22  his allegation that individual property valuation via an AVM [automated valuation model], as

23  opposed to an appraisal, was used by Citibank to support reduction of his line."  (Def. Mot. 6.)  In

24  support, Citibank asserts that agency interpretations of Regulation Z demonstrate both that banks

25  are not obligated to obtain appraisals as well as that AVMs are an acceptable means of valuing

26  properties.  (Def. Mot. 6-7.)

27        Citibank's argument misses the point; the Complaint does <u>not</u> allege that the use of AVMs

28

is *per se* improper – it alleges that Citibank used them improperly.  The Complaint alleges that Citibank's AVMs were faulty because they were based on fundamentally unreliable data, including the supposed decline of home values in broad geographic areas, which Regulation Z prohibits (Compl. ¶¶ 5, 31-32.)  As a result, Citibank systematically undervalued the properties of Levin and others and failed to adequately monitor customers' home values.  (Compl. ¶¶ 4, 34-35.)  Citibank ignores these allegations.  Consequently, Citibank's assertions that AVMs are generally permitted and that it was not obligated to obtain an appraisal (Def. Mot. 6) are irrelevant in that they ignore these allegations.[6]

In any case, the very same agency interpretations Citibank relies upon are themselves careful to warn that AVMs may not be used to devalue homes with impunity.  *See* OTS Guidance, 3 (*citing* May 16, 2005, OTS CREDIT RISK MANAGEMENT GUIDANCE FOR HOME EQUITY LENDING ("2005 AVM Guidance")).  To the contrary, federal regulators have admonished the banks that:

> When AVMs are used to support evaluations or appraisals, the financial institution should validate the models on a periodic basis to mitigate the potential valuation uncertainty in the model.  As part of the validation process, the institution should document the validation's analysis, assumptions, and conclusions. The validation process includes back-testing a representative sample of the valuations against market data on actual sales (where sufficient information is available).  The validation process should cover properties representative of the geographic area and property type for which the tool is used.

2005 AVM Guidance, at 5.  Hence, the mere fact that Citibank used an AVM does not shield it from liability if the AVM was critically flawed so that use of the AVM was unreasonable.  Accordingly, the allegations suffice to put Citibank on notice of valid and cognizable causes of action for violations of TILA and Regulation Z, meaning its Motion to Dismiss should be denied.

B.     *The Complaint adequately alleges Citibank breached Levin's HELOC contract.*

---

[6]      Citibank suggests, without explanation, that the Complaint's allegations as to the problems with Citibank's use of AVMs are insufficient because they are based "on information and belief."  (Def. Mot. 7.)  This is not persuasive, as allegations based upon a plaintiff's information and belief are sufficient where, as here, the factual basis of the allegations is known by or in the possession of the defendant.  *Wyeth*, 2006 WL 6103249 at *3 (plaintiff's claims for willful infringement made on information and belief were sufficient under federal pleading rules); *Langadinos v. American Airlines, Inc.*, 199 F.3d 68, 72-73 (1st Cir. 2000) (a plaintiff can make allegations based upon his information and belief and a generalized statement of facts is adequate so long as it puts the defendant on notice to file a responsive pleading.)

Citibank's arguments against Count III hold no weight.  The Complaint presents two breach of contract theories.  First, Levin alleges his HELOC agreement allowed Citibank to prohibit additional extensions of credit or reduce his credit limit only in limited circumstances, including when "the value of the Property declines significantly below the Property's appraised value."  (HELOC, ¶10.)[7]  Citibank argues that Count III is insufficient because the HELOC expressly permitted Citibank to decrease Levin's credit limit.  (Def. Mot. 7.)   As with Citibank's arguments attacking Counts I and II, this is a red herring.  The HELOC contract permitted a reduction in the credit limit only for specific reasons (which mirror Regulation Z) none of which had occurred here.  Again, as alleged in the Complaint the value of Levin's property had not significantly declined.  (Compl. ¶¶ 34, 43-47.)  Accordingly, Citibank simply had no right to reduce Levin's credit limit under the circumstances, meaning its action violated the terms of the HELOC that Citibank itself had drafted.

Citibank offers no response at all to these allegations.  Citibank does not suggest that its home valuation was proper, nor—despite the fact it attaches a declaration in support of its Motion—does it attempt to quantify the "significant" reduction in value that it claims to have occurred.  The HELOC required a significant reduction in home value by its very terms; Levin alleged there was no such reduction and that Citibank's contrary finding was reached through the use of flawed AVMs.  Citibank additionally argues the claim fails due to the absence of an allegation as to Levin's home equity.  This argument is misplaced and unsupportable.  The standard under Regulation Z, as well as the HELOC contract Citibank drafted, speak to property value.  Citibank's March 2008 reduction letter concedes as much by omitting any reference to equity in the property.  (Compl. ¶ 3.)  As a result, Levin alleges that the market value of his home did not significantly decrease so as to trigger Citibank's right to reduce the line.  (Compl. ¶¶ 34, 47.)  Nothing more is required.  *See Swierkiewicz*, 534 U.S. at 11; *Gibson*, 781 F.2d at 1340.

In any case, Levin is additionally not required to plead the available equity because, as the Complaint alleges, Citibank failed to disclose the appraised value of the property for the purposes

---

[7]    As Citibank has not placed any of them at issue, none of the other bases in the HELOC for reducing the credit line are applicable to this action at this time.

Plaintiff David Levin's Opposition to Defendant's Motion to Dismiss
Case No. C 09-00350-MMC

10

of Levin's HELOC plan or the balance of Levin's first mortgage at the time the HELOC was initiated—both of which are details needed to determine equity. As these facts are peculiarly within Citibank's possession, the law does not impose a burden on Levin to plead them. *Wyeth*, 2006 WL 6103249 at *3.

The Complaint also alleges in the alternative that Citibank breached the HELOC contract by not reinstating the credit limits of Levin and borrowers like him after the value of their respective homes were no longer "in significant decline." (Compl. ¶ 47.) Citibank's demand that Levin obtain his own appraisal was, itself, a breach of contract, since the HELOC drafted by Citibank, as well as Regulation Z, required Citibank to actually investigate the matter itself rather than require Levin to initiate such investigation. (HELOC ¶ 10.) Citibank never informed Levin of its valuation of his home or what value would be required to reinstate his original credit limit. Thus, and as discussed below in connection with Levin's fraudulent concealment claim, Levin had no way to gauge the utility of seeking a new appraisal.

Citibank argues for dismissal because the contract supposedly required Levin to request reinstatement in writing and that Levin failed to make such a request. (Def. Mot. 7.) Citibank is estopped from making this attack. Citibank's March 2008 letter to Levin waived any such term of the HELOC by specifically stating that Levin should call to discuss the matter with a customer service representative. (Compl. ¶ 3.) When Levin relied on the letter and contacted Citibank by telephone, he was informed that reinstatement of the original credit limit would only be possible if he obtained an appraisal, at his own expense, which indicated that his home value was not in significant decline. (Compl. ¶ 17.) Levin does not allege he was instructed on the phone to submit a written reinstatement request. Hence, as with his other breach of contract claims, Levin's alternate breach of contract causes of action have been sufficiently pleaded, Citibank's attacks have no merit, and, as a result, the claims should be allowed to proceed.

## II. Counts V, VIII and X: Citibank's Violations Of The Covenant of Good Faith and Fair Dealing Are Sufficiently Pleaded And Should Not Be Dismissed.

Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement. RESTATEMENT (SECOND) OF CONTRACTS § 205. The covenant

requires "that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Helfand v. Nat'l Union Fire Ins. Co.*, 10 Cal. App. 4th 869, 903 (1st Dist. 1992) (internal citations omitted); *see also McCollum v. XCare.Net, Inc.*, 212 F. Supp. 2d 1142, 1152 (N.D. Cal. 2002) ("[I]f one party exercises its discretionary authority in bad faith for the purpose of frustrating the other party's legitimate expectations, it has breached the implied covenant.")  Furthermore, and so long as the claims are not duplicative, "a breach of the contract may also constitute a breach of the implied covenant of good faith and fair dealing." *See Guz v. Bechtel Nat'l. Inc.*, 24 Cal. 4th 317, 377 (2000).

Citibank's primary argument for dismissal of Counts V, VIII and X is that a claim for breach of the covenant of good faith and fair dealing cannot be identical to a claim for breach of contract.  (Def. Mot. 9-10.)  This fails because Levin's counts alleging breach of the covenant are distinct from his claims for breach of contract.  Count III pleads a breach of contract claim premised on Citibank's improper reduction of Levin's credit limit in violation of the express terms of the HELOC.  Count V, on the other hand, is a breach of the covenant of good faith and fair dealing claim premised on the improper notice provided by Citibank, not merely the illegality of the credit limit reduction.  (Compl. ¶ 61.)

None of the three counts for breach of the covenant seek to hold Citibank liable for its decrease in the credit limit.  Instead, they seek to hold Citibank liable for its other actions such as failing to give notice and assessing fees against Levin, all of which are examples of Citibank arrogating the benefits of the HELOC for itself while preventing Levin from doing the same.  Levin is not attempting to merely bootstrap its breach of contract claims into a breach of the covenant of good faith and fair dealing – these are entirely separate claims.  Accordingly, dismissal is unwarranted.

Levin pleads that Citibank's actions prevented him from receiving the benefits of his HELOC in three different ways, each of which supports a claim for breach of the covenant.  First, Citibank's abrupt credit limit reduction caused Levin to incur not-sufficient-funds fees when he attempted to utilize his credit line during the period between Citibank's freezing of his credit limit and Citibank's informing Levin that it had done so.  (Compl. ¶¶ 61-63.)  Citibank could have sent

notice pursuant to 12 C.F.R. § 226.9(c)(3) that stated the reduction would take effect upon receipt, or three days following the date of the letter, so long as the letter was mailed on the date it was created.  There were a number of available alternatives to minimize the likelihood that borrowers would write bad checks.  Citibank ignored these.  For its chosen method, then, good faith requires Citibank to either honor such checks or, at the very least, cover such fees.

Second, Citibank's imposition of an early termination fee is a textbook example of a breach of the covenant.  Citibank's account freeze prevented Levin from using the credit upon which he relied.  When Citibank refused to perform further under the HELOC, Levin sought to mitigate his damages by obtaining replacement credit.  Citibank then charged Levin a fee to close the account that it no longer let him use.  (Compl. ¶¶ 79-80.)

Finally, Citibank charged Levin an annual fee in exchange for the availability of credit under the HELOC.  When Citibank froze Levin's credit, it ensured that Levin would not receive the benefit of the HELOC, while Citibank itself retained its annual fee and all other benefits of the contract, never refunding any portion of the annual fee.  (Compl. ¶¶ 92-95.)

Irrespective of whether they are taken together or viewed separately, Citibank's actions show an unmistakable pattern of frustrating the common purpose of the HELOC – Citibank made sure that it received the benefits of the HELOC, and made equally sure that Levin did not.  As a result, the breach of the covenant of good faith and fair dealing claims survive.

**III.    Count VI:  Levin States Claims for Fraudulent Concealment.**

The elements of a claim for fraudulent concealment are:  (1) suppression of a material fact, (2) by one who is bound to disclose it (3) with intent to deceive a person unaware of the concealed fact and who would not have acted or not acted had he known of the fact.  *See, e.g.*,

*Melanson v. United Air Lines, Inc.*, 931 F.2d 558, 563 (9th Cir. 1991).

Citibank structured its notice such that it ensured Levin and other customers would risk writing bad checks. Levin himself wrote two such checks. (Compl. ¶ 68.) As discussed above, it could have sent notice that complied with Regulation Z and minimized this risk but chose not to. That Citibank allegedly imposes its own insufficient funds fees demonstrates it had powerful financial incentives to provide notice they way it did. (Compl. ¶ 68.)

Moreover, the Complaint alleges, and incorporates into the fraudulent concealment claim by reference (Compl. ¶ 64), that Citibank knowingly failed to disclose information necessary so that Levin and the other class members could determine whether or not to order an appraisal or otherwise challenge Citibank's determination to reduce their credit limits. As stated above, 12 C.F.R. § 226.9(c)(3) imposed a duty upon Citibank to provide specific notice. Without knowing what the present supposed value of his home was, what the initial value was, or what an appraisal would have to show in order for reinstatement, Levin could not possibly discern whether it made financial sense to appeal for reinstatement. This is precisely what Citibank wanted, and achieved, by concealing this information—as few appeals or challenges to its credit limit reductions as possible. It is also precisely what Levin did by foregoing the appeals process and opting instead to seek alternative financing. Accordingly, two bases exist under these facts for fraudulent concealment, neither of which have been shown to be inadequate by Citibank.

## IV.   Counts IV, VII, IX and XI:   The Complaint Sufficiently Sets Forth Claims Under California's UCL.

Citibank has presented no legal basis for dismissing Levin's UCL claims. Instead, Citibank raises two arguments, both of which fail.

Citibank's first argument is that Levin's UCL claims are simply "repackaged" from Levin's TILA and breach of contract claims, and fail because those TILA and contract claims fail. (Def. Mot. 11.) While the core facts underlying the claims are similar, the claims themselves are legally distinct. In the UCL claims, Levin alleges that the March 2008 letter that he received from Citibank (and the form letter that all purported class members would have received) was "deceptive and untrue" because it was based on a home valuation process that intentionally or

recklessly undervalued the value of Levin's home.  (Compl. ¶¶ 52-53.)  The Complaint further alleges that the letters from Citibank were false and deceptive because Citibank "either recklessly used AVMs which did not have adequate safeguards to ensure their integrity or intentionally manipulated AVMs to justify" reducing the credit limits.  (Compl. ¶ 53.)  Thus, while premised on the same improper property valuation technique as the TILA and contract claims, the UCL claims assert that such illegal valuations formed the basis of deceptive written communications and constituted an independent tort under California law.

Additionally, the UCL claims explain why the actions of Citibank were unfair in light of Citibank's role in the recent real estate crisis and financial crisis, and the fact that the reduction in credit has continued to depress real estate values that Citibank then uses as an excuse to further tighten credit.  (Compl. ¶¶ 3-7, 54, 86.)  Citibank also ignores Levin's allegation that the reduction of, and failure to reinstate, his HELOC offends public policy and/or violates the policy or spirit behind TILA, Regulation Z, Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, and the UCL.  (Compl. ¶ 54.)

Citibank's second argument is that Levin's UCL claims must fail since Citibank's actions were purportedly authorized by TILA and the HELOC.  (Def. Mot. 12.)  This is not true in light of the explanation above that Citibank indeed violated TILA and breached the HELOC contract. This argument is also legally incorrect insofar as it asserts that UCL claims can never survive if concomitantly alleged TILA or breach of contract claims are dismissed.  *See Monaco v. Bear Stearns Residential Mortgage Corp.*, 554 F. Supp. 2d 1034, 1039-40 (C.D. Cal. 2008) (holding that plaintiff borrowers' UCL claim premised upon defendant lender's alleged TILA violation was sufficient to survive a motion to dismiss despite the court's dismissal of TILA claims under the statute of limitations).  Citibank does not assert any basis for dismissing the UCL claims independent of the TILA and breach of contract claims.  Thus, Citibank effectively concedes that the UCL claims should not be dismissed if either the TILA or breach of contract claims are not dismissed.  For all the reasons set forth in Section I, above, the TILA and breach of contract claims are proper and sufficient.  The fact that TILA authorizes lenders to reduce HELOC limits in some circumstances does not mean that it authorized Citibank to reduce limits in the manner

alleged.

The only new argument raised by Citibank is that the Complaint's allegations "affirmatively show that Citibank's notification to Levin of the reduction of his credit limit complied with TILA's Regulation Z" and that, accordingly, Levin "has not alleged any statutory violation that could support a claim of an unlawful business practice under the UCL." (Def. Mot. at 11-12.) This assertion is false. As explained *supra*, Citibank's notice to Levin was improper under TILA in that it was both untimely and unspecific. Additionally, Counts I and II include allegations of TILA violations relating to failure to confirm that the value of each home had significantly declined, as well as improper property valuation and use of the AVMs. (Compl. ¶¶ 29-42.) As a result, Counts IV, VII and XI survive.

## V.   Count I, IV, VII, IX and XI: Levin Has Standing To Pursue Declaratory Relief Under TILA And The UCL.

Citibank's final argument is that Levin lacks standing to seek declaratory relief under TILA and the UCL, as set forth in Counts I, IV, VII, IX and XI of the Complaint. Citibank's theory is that because Levin mitigated his damages by paying off his Citibank HELOC and obtaining a new HELOC from another bank, he is now unable to show a basis for future harm. (Def. Mot. 15.) Citibank's standing argument is legally incorrect.

Under the test laid out in cases such as *Nelsen v. King County*, 895 F.2d 1248 (9th Cir. 1990), and *Hodgers-Durgin v. De La Vina*, 199 F.3d 1037 (9th Cir. 1999), cited by Citibank, a plaintiff can show standing for injunctive relief by showing "continuing, present adverse effects" of the defendant's past conduct or by showing "a threat of future harm." *Nelson*, 895 F.2d at 1251. Levin meets both standards.

Citibank uses the fact that Levin is no longer a Citibank HELOC account holder as its reason why he can no longer seek injunctive relief against it—ignoring the facts that it did everything in its power to force Levin to seek other credit (Def. Mot. 15.) which he ultimately did in order to mitigate his damages. It was Citibank that unilaterally decreased Levin's credit limit without any advance warning, that then refused to honor checks drawn on that account prior notice of the credit limit reduction, that refused to reimburse Levin for those fees or its annual fee

for the HELOC, and that required Levin to obtain and pay for his own property appraisal as a precondition of reinstatement.  As of the time of filing, and continuing to today, Citibank remains in breach of the HELOC and remains in violation of TILA with respect to Levin.

In any case, the authority cited by Citibank is inapposite.  While Citibank cites to some cases relating to consumer actions where courts found former customers unable to pursue injunctive relief, *see, e.g., Cattie v. Wal-Mart Stores, Inc.*, 504 F. Supp. 2d 939 (S.D. Cal. 2007), those cases did not involve a continuing harm to the class representative.  For example, in *Deitz v. Comcast Corp.*, No. C 06-06352 WHA, 2006 WL 3782902, at *4 (N.D. Cal. Dec. 21, 2006) the named plaintiff was no longer a Comcast subscriber and therefore was not likely to receive another disputed charge.  Likewise, as Citibank acknowledges, in *Nelsen* the alleged injury could only reoccur if the plaintiffs remained indigent, continued to drink uncontrollably, committed an alcohol related offense, be prosecuted and convicted for that offense, be offered the choice to reenter the treatment center, accept that choice, and then find the conditions to be the same as they were before they had left the treatment center.  895 F.2d at 1252.

In this case, conversely, a lack of declaratory and/or injunctive relief would permit Citibank to continue its illegal and deceptive actions, which would have the effect of continuing to harm the financial interests of Levin and the other class members.  Levin's risk of repeated harm is not so attenuated.  When Levin's neighbor is charged a fee by Comcast or mistreated by an alcohol treatment center, Levin is unaffected.  Unlike cases of cable fees or attenuated repetitive civil rights violations, real estate is different.  Using faulty models to devalue his neighbor's homes adversely affects the value of Levin's home.  Likewise, cutting off credit to thousands of borrowers significantly impairs the economy as a whole, causing continued damage to Levin.

Preservation of Levin's right to seek equitable remedies such as an injunction is also consistent with the preservation of other rights to equitable relief under TILA.  For example, several Circuit Courts have held that a consumer is entitled to the remedy of rescission under TILA even if the consumer has already paid off the loan, which would otherwise moot equitable remedies.  *See Barrett v. JP Morgan Chase Bank, N.A.*, 445 F.3d 874, 879 (6th Cir. 2006)

(holding that "preservation of the right [of rescission] prevents a refinancing . . . from insulating lenders from responsibility for their noncompliance" with TILA); *Handy v. Anchor Mortgage. Corp.*, 464 F.3d 760, 765 (7th Cir. 2006) (holding that the "remedies associated with rescission remain available even after the subject loan has been paid off"); *but cf. King v. California*, 784 F.2d 910, 913 (9th Cir. 1986) (a heavily criticized case stating in cursory fashion that a loan "cannot be rescinded . . . [if] there is nothing to rescind.")  Although rescission is not an issue in this matter, these cases, and especially the more recent cases, show that equitable remedies under TILA are to be broadly construed.

Levin also has standing under the threat of future harm.  Citibank is one of the largest banks in the United States and one of the largest providers of HELOCs.  All it would take for Levin to find himself subjected to the same harm again is for him to get another HELOC from Citibank.  Considering Citibank's size and its ability to advertise possible rate reductions or other incentives, Levin could easily find himself applying for similar credit with Citibank in the future, a "real probability" as Citibank puts it.  (Def. Mot. 13.)  As seen in other cases where a former customer seeks injunctive relief, Levin could readily cure the pleadings by adding the allegation that he would return to Citibank as a HELOC customer if Citibank changed its policy of arbitrarily and unlawfully reducing HELOC credit limits.  *See, e.g., Dietz*, 2006 WL 3782902 at *3 (plaintiff could not state or demonstrate "that he will re-subscribe to cable services if he is not required to rent cable equipment from defendants.")  Unlike the consumer in *Dietz*, Levin could make the allegation here.

In short, this situation is readily distinguishable from a basic consumer transaction that has been finalized or a civil rights violation that could not happen again.  Levin and the other class members will continue to be harmed without declaratory and/or injunctive relief.  Accordingly, Levin's risk of ongoing injury is real and substantial as will further be established in discovery. He has standing to pursue declaratory and injunctive relief and the Motion should be denied.

1

**CONCLUSION**

2        Citibank is attempting to force Levin to prove his case in his Complaint.  There is no basis

3  for this, and federal notice pleading requires only that the Complaint provide reasonable notice of

4  plausible causes of action.  The Complaint's allegations satisfy this burden, and Citibank simply

5  does not satisfy its burden of establishing otherwise as a matter of law.  For all of the reasons set

6  forth above, Citibank's Motion should be denied in its entirety.[9]

7

8                                         Respectfully submitted,

9                                         PARISI & HAVENS LLP

10

   Dated: July 24, 2009

11

12                                By: ___/s/ Suzanne Havens Beckman___
                                         SUZANNE HAVENS BECKMAN, ESQ.
13                                       Attorneys for David Levin, on his own
                                         behalf and on behalf of all those similarly
14                                       situated

15

16

17

18

19

20

21

22

23  _____
    [9]      In the event this Court disagrees, Plaintiff respectfully requests leave to add further detail,
24  additional claims, or otherwise take such other steps necessary to cure any pleading deficiencies
    found by this Court.  *See Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401
25  (9th Cir. 1986) ("If a complaint is dismissed for failure to state a claim, leave to amend should be
    granted unless the court determines that the allegation of other facts consistent with the
26  challenged pleading could not possibly cure the deficiency.") (citation omitted); *Doe v. U.S.*, 58
    F.3d 494, 497 (9th Cir. 1995) (leave to amend should be granted even if the plaintiff did not
27  request leave, unless it is clear that the complaint cannot be cured by the allegation of different
    facts).
28